1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PAUL GALLOWAY,

               Petitioner,

  v.

DERRAL ADAMS, Warden,

               Respondent.

_____/

No. C 03-04096 JSW

**ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

Paul Galloway ("Petitioner"), a prisoner of the State of California, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. After consideration of Petitioner's claims on the merits, the petition for writ of habeas corpus is DENIED.

## PROCEDURAL BACKGROUND

On February 18, 1999, a jury in Santa Clara County found Petitioner guilty of second degree murder, attempted non-premeditated murder, and vehicle theft. The jury found Petitioner not guilty of conspiracy to commit murder. On May 14, 1999, Petitioner was sentenced to a total state prison term of 19 years plus 20 years to life.

Petitioner appealed his convictions, and the Court of Appeal affirmed the judgment of the trial court on March 7, 2002. On April 13, 2002, Petitioner submitted a petition for review in the California Supreme Court. The Supreme Court denied the petition for review on June 12, 2002. On September 7, 2003, Petitioner filed a petition for writ of habeas corpus in the Supreme Court of California, which was denied on December 1, 2004. Petitioner filed his petition for writ of habeas corpus in this Court on September 8, 2003. Because the Petition

1   contained unexhausted claims, Petitioner asked this Court to hold his petition in abeyance while

2   he exhausted his state remedies.  The Court granted Petitioner's request, and Petitioner filed his

3   amended petition with this Court on December 22, 2004.

**FACTUAL BACKGROUND**

5   The facts underlying the charged offenses as found by the Court of Appeal are set forth

6   as follows:

> Appellant was tried with two co-defendants, Johnny Dagnino and Aaron Moronez, for the attempted murder of Daniel Barragan, the murder of his brother, David Barragan, and conspiracy to commit murder.  The three defendants were also tried for the auto theft.  All were acquitted of the conspiracy charge, all were convicted of auto theft, and appellant was convicted of second degree murder.  Dagnino and Moronez were also acquitted of the murder and the attempted murder charges.
>
> On August 12, 1997, in the early evening, David Barragan was shot and killed as he drove his Ford Escort accompanied by Daniel Barragan, on Story Road in San Jose.  The shots came from a gray Honda driven by Dagnino, with Moronez the front seat passenger and appellant riding in the back seat.  Appellant acknowledges "[t]he undisputed evidence demonstrated that appellant fired at Daniel while Daniel was a passenger in the Ford Escort driven by his brother, David."
>
> The evidence at trial was that Daniel Barragan had been involved with Sabrina Galloway, appellant's sister, for several years beginning when she was 13 and he was 18, and they had two children.  At the time of the trial, Daniel was in prison serving time for domestic violence against Sabrina.  After Daniel and Sabrina broke up, Daniel moved to Merced, where his brother David lived.  Appellant lived with his parents and Sabrina and her two children.  Daniel would sometimes visit.  Around August 10, 1997, he stayed at the home of Sylvia Tapia on Mount Pleasant Road.  Sylvia lived there with her daughters Melissa and Leticia Croft.  Leticia's boyfriend, Ricardo Villa, was also staying there.  For awhile, appellant, Daniel, Dagnino and Villa were all friends.
>
> Around 6:30 p.m., on August 12, 1997, appellant, Dagnino and Moronez arrived at Sylvia's house in a Honda Accord.  Dagnino's visit to Ricardo was for the purpose of exchanging clothes.[1]  According to Melissa, Dagnino was just about to leave when Ricardo and Daniel returned from an outing.  Daniel's brother David was soon to pick up Daniel and give him a ride back to Merced.  Sylvia had heard earlier in the afternoon that there was trouble brewing between appellant and Daniel.

---

[1]   "Ricardo" told a defense investigator there was no bad blood between Dagnino and Daniel Barragan.  Dagnino was coming over to smoke marijuana.  (Footnote as in opinion.)

2

It was a hot day but appellant, Moronez and Dagnino wore gloves and appellant was wearing an untucked, Pendleton shirt. They looked serious, and appellant looked angry. They parked the Honda on Mount Pleasant. Sylvia told appellant to leave because she did not want any trouble in front of her children. Dagnino and Moronez remained in the car, but appellant got out and approached Daniel in the driveway. Daniel and appellant argued, and appellant pointed down the street toward a nearby school. Appellant challenged Daniel to fight there. Sylvia testified Daniel did not want to leave. Daniel said he was leaving town, and appellant replied that in that case he wanted to take care of him then. Appellant hugged Daniel and got in the car. Ricardo assumed there would be a fight.

David pulled up in a Ford Escort to pick up Daniel. Sylvia heard appellant say that David had something in his back pocket. David lifted his shirt and turned around in a circle so that appellant could see there was nothing tucked in his waist. Appellant Dagnino and Moronez drove down the street and parked on a side street. When Daniel told David appellant was down the street, David said "fuck him." Sylvia tried to convince Daniel and David to stay at her house, because she was afraid that something would happen to them if they left. David and Daniel left with David driving and Daniel in the front passenger seat. The Honda pulled out quickly and followed them to Story Road. The Honda made between one and four lane changes in order to pull up parallel to the Escort. The Escort was in the middle lane, and the Honda was in the slow lane.

That night, Daniel told Ricardo about the shooting about five hours afterward.[2] Daniel described it essentially the same way in a statement to police the next day. Daniel told detective Christopher Knopf that he had a fight with his ex-girlfriend Sabrina Galloway. Appellant and Dagnino came over and challenged Daniel to a fight. Daniel would not fight and he did not have a weapon.

Daniel told Knopf he and David were traveling on Story Road when the Honda came up on their right side. He ducked down when he heard five or six gunshots. When he looked at his brother, he saw that David was slumped over the wheel. David had been shot in the head. Daniel grabbed the steering wheel and tried to steer the car to the right curb. Daniel opened his door while the car was still moving and exited the car. He tried to run after the Honda, but was hit by the Escort, which was still rolling. Daniel looked at his brother, saw that he was not moving, and ran from the scene. He ran to his aunt's house, called his brother Donald and then called Sylvia Tapia.

At trial, Daniel essentially disclaimed his statement to Knopf. He testified he only remembered jumping out of the car and running. He was under the influence of beer, methamphetamine, PCP and marijuana at the time.[3] Daniel denied telling the police that appellant, Dagnino and Moronez chased them in the Honda and fired shots at them. He testified that he did not tell the police that

---

[2] At trial, Ricardo testified he did not remember Daniel telling him about the shooting. (Footnote as in opinion.)

[3] The police took a sample of Daniel's blood after the shooting. Daniel could not explain why the lab found no alcohol or controlled substances in his blood. Ricardo and Daniel had spent the last two days together and, to Ricardo's knowledge, Daniel had not used any illegal drugs and had not been drunk. (Footnote as in opinion.)

3

United States District Court

For the Northern District of California

1   appellant yelled "pull over, punk, pull over, motherfucker," and he did not tell the
2   police that he heard five or six gunshots.

3   Jose Alcala was about to turn onto Story Road at the time of the shooting.
    He saw the gray Honda speed by. He thought the occupants were going to rob a
4   bank. The Honda changed lanes to pass traffic. Alcala heard gunshots, and saw
    appellant in the back seat of the Honda with both arms extended and hands clasped
5   over an object pointing at the Escort. The object appeared to be covered. The
    occupants of the Escort did not point anything at the Honda, or throw anything or
6   yell at the Honda. After the shooting, the Escort swerved and almost hit a fire
    hydrant. It looked like the driver of the Escort passed out, and the passenger tried
7   to control the car. When the passenger jumped out, the car ran over his leg. The
    Honda sped away.

8   David Marichalar was a passenger in a car on Story Road at the time of the
    shooting. He heard the gunshots, and saw the driver slumped over the steering
9   wheel. He noticed a gray Honda was right next to the other car. Marichalar told the
    police all three occupants of the gray car laughed and joked about what happened.
10  At trial, admitting he was afraid to testify, he said only appellant engaged in that
    behavior. He wrongly thought the occupants of the Honda were Asian and that
11  appellant was skinny.

12  Donald Barragan received a telephone call from his brother Daniel between
    6:30 and 7:30 that night. Daniel was hysterical. Daniel had requested earlier that
13  afternoon that Donald supply him with a gun. In this call, Daniel told Donald it was
    too late to get him a gun because they had already killed David. Donald never
14  obtained a gun for Daniel.

15  Around 8:30 the night of the shooting, someone called Sylvia and she went
    to pick up Daniel. Daniel told her appellant had shot David. Sylvia drove Daniel
16  to various phone booths so he could call hospitals to find out what happened to
    David. Daniel had outstanding warrants. Around midnight, she dropped him off
17  at Ricardo's residence because she thought he could better hide from the police
    there than at her house. He was arrested there the morning of August 13, 1997. He
18  had bruises and scrapes on his head, arms and torso.[4]

19  Officers examining the Escort found blood in and around the car. Most of
    the blood was on the driver's side of the car, on the door, seat and roof. The front
20  winshield had a bullet hole in it, and the passenger side window was broken. Inside
    the car were an empty beer bottle, a white T-shirt, a folding butterfly knife and two
21  spent rounds. The floor of the car had a strong odor of beer. Three additional spent
    rounds were found in a nearby apartment building. All were fired from the same
22  nine-millimeter weapon. Each round required a separate pull of the trigger. The
    bullet that killed David exited his head and was not recovered. The trajectories of
23  the bullets that struck the Escort had been determined by placing wooden dowels
    through their entry and exit holes. It appeared the shots were all fired at the
24  passenger while the Honda and the Escort were traveling side by side. Firearms

25  _____

26      [4]    There is a bushy creek near the shooting site, which Daniel could have run
    down after the shooting. The police did not search the creek for a weapon. Daniel was dirty
27  and scratched up afterwards. (Footnote as in opinion.)

28                                        4

expert Christopher Coleman testified that the shooter may or may not have been adjusting his aim with each shot.

Defense witness John Anaya testified he was on Story Road and the Escort was in the lane next to him.  The Escort picked up speed and passed Anaya. Another car made a sudden move and passed Anaya.  That car, a Honda, was then in front of Anaya.  The people in the Honda made aggressive hand gestures toward the people in the Escort.  The people in the Escort looked at the Honda but did not make any gestures.  The Honda's front seat passenger ducked down, came up with a handgun and fired several shots rapidly at the Escort.  He held the gun steady and fired out of the driver's window.

Sabrina Galloway testified Daniel physically abused her during their relationship.  He threatened to get her if she had him arrested.  He also threatened her family and her children.  He said he would shoot her and kill her.  Sabrina had seen Daniel with guns many times, he always had a gun or knife or some kind of weapon with him.  Sabrina told appellant she was afraid Daniel would shoot her one day.  Appellant and Daniel had at least one physical fight and several arguments. In May 1997, Daniel choked and slapped Sabrina.  She called the police, but Daniel left.  Sabrina heard he moved to Merced with his new girlfriend.  In August 1997, Daniel told her he had been out of town but was back.  Sabrina told appellant Daniel had called her and threatened her.  Appellant became angry and said he was going to "kick [Daniel's] butt again."

Appellant testified he shot at the Escort in self-defense.  He knew about Daniel's abuse of his sister and that Daniel had threatened his entire family.  He was afraid Daniel would hurt him.  In May, appellant asked Daniel what had happened to Sabrina and Daniel pulled out a gun and asked "[d]o you want some?" before driving away.  Appellant testified Daniel called him the day before the shooting and appellant asked Daniel where he was because he wanted to fight him.  Daniel said next time appellant saw Daniel he had "better be strapped," meaning armed with a gun, "because somebody is going to die."

Later that day, appellant obtained a loaded gun with the safety in the off position from a neighborhood drug dealer.  He did not tell anyone he had it, and kept it tucked in his waistband under his long Pendleton shirt.

On August 12, 1997, Moronez dropped by appellant's house.  Dagnino drove by in a Honda, and appellant asked for a ride to go pay for the gun he had just obtained.  Because Dagnino always drove stolen cars, appellant assumed the car was stolen, and complied with Dagnino's request to wear gloves while in the car.

Dagnino drove appellant and Moronez to Leticia's house.  Dagnino went into the house for a couple of minutes.  Ricardo and Daniel pulled up and Daniel said "let's take this down the street" meaning they should fight at the nearby school. When they got to the school, Daniel said he was going to park, but returned to Sylvia's and parked in her driveway.  The Honda stayed at the school for about ten minutes.  Appellant, Dagnino and Moronez returned to Sylvia's because Daniel did not show up.

5

United States District Court

For the Northern District of California

1

2
Appellant was very angry and confronted Daniel about why there was no fight. Appellant asked Daniel if he had a weapon. Daniel threw a knife over Sylvia's fence.

3

4
Daniel and appellant started arguing. Appellant testified Daniel wanted to fight. He said he did not hug Daniel. Daniel put his arm on appellant's lower back and said, "[l]et's go do this" and appellant pushed him away.

5

6

7
David drove up in the Escort. When David got out of the car, appellant thought he was under the influence of PCP and accused him of being armed. Appellant said he saw a gun handle protruding from David's waistband, but David said it was none of his business. David slid the gun from the back of his waistband toward the front and said "fuck you."

8

9

10

11

12
Appellant, Dagnino and Moronez drove down the street and waited. Appellant took out his gun and put it in his lap. Daniel made a hand gesture when the Escort drove by, which appellant interpreted as meaning for the Honda to pull up with the Escort. Appellant asked Daniel where he was going and yelled at him to pull over. When he told Daniel to pull over, Daniel lifted a gun in his left hand. Daniel pointed the gun at them and appellant started shooting. Appellant testified he fired the gun rapidly, after ducking. He testified he reacted without thinking. Dagnino was furious because he did not know appellant had a gun. He pulled over and ordered appellant and Moronez out of the car. Appellant walked away and threw the gun in a dumpster.

13

14

15

16
The defense introduced evidence that Daniel stabbed his brother Donald during an argument at a wedding reception. Donald had intervened when Daniel threatened his stepfather. Donald testified this incident was an accident. On rebuttal, the prosecution presented testimony calling into question Sabrina's testimony that Daniel had threatened her the day before the shooting.

17
(Answer, Ex. 4 (brackets as in opinion).)

18
**STANDARD OF REVIEW**

19
This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

20
custody pursuant to the judgment of a State court only on the ground that he is in custody in

21
violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a); *see*

22
*also Rose v. Hodges*, 423 U.S. 19, 21 (1971). Because the petition in this case was filed after

23
the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

24
AEDPA's provisions apply. *See Little v. Crawford*, 449 F.3d 1075, 1079 (9th Cir. 2006) (citing

25
*Woodford v. Garceau*, 538 U.S. 202, 207 (2003)).

26
Under AEDPA, which provides for a deferential standard of review, a federal court may

27
grant the writ with respect to any claim that was adjudicated on the merits in state court only if

28

6

1   the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or

2   involved an unreasonable application of, clearly established Federal law, as determined by the

3   Supreme Court of the United States; or (2) resulted in a decision that was based on an

4   unreasonable determination of the facts in light of the evidence presented in the State court

5   proceeding." 28 U.S.C. § 2254(d); *see also Williams (Terry) v. Taylor*, 529 U.S. 362, 413

6   (2000) (hereinafter "*Williams*").  It is the habeas petitioner's burden to show he is not precluded

7   from obtaining relief by § 2254(d).  *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

8   "[C]learly established federal law, as determined by the Supreme Court of the United

9   States," is restricted to "the holdings, as opposed to dicta, of [the Supreme] Court's decisions as

10  of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412; *Barker v. Fleming*,

11  423 F.3d 1085, 1093 (9th Cir. 2005) ("clearly established" federal law determined as of the time

12  of the state court's last reasoned decision).  The Supreme Court has emphasized that "[a] federal

13  court may not overrule a state court for simply holding a view different from its own, when the

14  precedent from [the Supreme] Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12,

15  17 (2003) (per curiam).

16  Under the "contrary to" clause of section 2254(d)(1), a federal court may grant the writ

17  only if the state court "'applies a rule that contradicts the governing law set forth in [Supreme

18  Court] cases', or if it 'confronts a set of facts that are materially indistinguishable from a

19  decision' of [the Supreme] Court and nevertheless arrives at a different result from [Supreme

20  Court] precedent." *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-

21  06).  "Under the 'unreasonable application' clause of [section 2254(d)(1)], a federal habeas

22  court may grant the writ if the state court identifies the correct governing legal principle from

23  [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the

24  prisoner's case." *Williams*, 529 U.S. at 413.

25  "[A] federal habeas court may not issue the writ simply because that court concludes in

26  its independent judgment that the relevant state-court decision applied clearly established

27  federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.*

28

**United States District Court**
For the Northern District of California

1   at 411. The objectively unreasonable standard is not a clear error standard. *Lockyer v.*

2   *Andrade*, 538 U.S. 63, 75-76 (2003); *Clark v. Murphy*, 331 F.3d 1062, 1067-69 (9th Cir. 2003).

3   After *Lockyer*, "[t]he writ may not issue simply because ... a state court's application of federal

4   law was erroneous, clearly or otherwise. While the 'objectively unreasonable' standard is not

5   self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than"

6   previously has been afforded to them. *Clark*, 331 F.3d at 1068.

7       In determining whether the state court's decision is contrary to, or an unreasonable

8   application of federal law, a federal court looks to the decision of the highest state court to

9   address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d

10   663, 669 n.7 (9th Cir. 2000). If the highest state court has denied a petitioner's claim summarily,

11   the habeas court may "look through" that decision to the last state court addressing the claim in

12   a reasoned decision. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000)

13   (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

14       The standard of review under AEDPA is somewhat different where the state court gives

15   no reasoned explanation of its decision and where there is no reasoned lower court decision on a

16   petitioner's federal claim. In such a case, a review of the record is the only means of deciding

17   whether the state court's decision was objectively reasonable. *See Hines v. Thompson*, 336 F.3d

18   848, 853 (9th Cir. 2003); *Greene v. Lambert*, 288 F.3d 1081, 1088 (9th Cir. 2002). Thus, while

19   normally a state court decision on the merits concerning a question of law should be afforded

20   deference, "[i]f there is no such decision on the merits, however, there is nothing to which to

21   defer." *Greene*, 288 F.3d at 1089.

22       Habeas relief is warranted only if the constitutional error at issue is structural error or

23   had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Penry*

24   *v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638

25   (1993)). Under this standard, if the federal court determines that the state court's harmless error

26   analysis was objectively unreasonable, and thus an unreasonable application of clearly

27

28

1    established federal law, the federal court then proceeds to the *Brecht* analysis.  *See, e.g., Medina*

2    *v. Hornung*, 386 F.3d 872, 878 (9th Cir. 2004).

3                                    **DISCUSSION**

4           Petitioner raises five claims for relief in his amended petition.  Petitioner's first claim

5    alleges that his trial counsel was ineffective because he: did not retain a ballistics expert; did not

6    retain a toxicology expert; and did not call Dagnino as a witness.  Petitioner's second claim

7    alleges that the trial court violated his constitutional right to present a defense, because the trial

8    court refused to instruct the jury on the defense theory of the case.  The third claim for relief

9    alleges that the trial court interfered with Petitioner's rights to the effective assistance of

10   counsel and to a fair trial by refusing to allow his investigator to sit at the defense table and by

11   limiting trial counsel's communications with his investigator.  Petitioner's fourth claim alleges

12   that he was deprived of a fair trial because of prejudicial prosecutorial misconduct.  In his final

13   claim, Petitioner alleges that the trial court violated his federal constitutional right to a public

14   trial and violated his procedural due process rights by closing the court room to the public when

15   a portion of the Petitioner's testimony was reread to the jury.  The Court will discuss each of

16   Petitioner's claims in turn.

17   **I.      Claim One.**

18          Petitioner's first claim is that his trial counsel was ineffective.  There is no reasoned

19   state court opinion deciding Petitioner's ineffective assistance of counsel claims.  Accordingly,

20   the Court has conducted an independent review of the record.  *Hines*, 336 F.3d at 853.

21          **A.      Legal Standard.**

22          In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner

23   must establish: (1) that counsel's performance was deficient, *i.e.* that it fell below an objective

24   standard of reasonableness under prevailing professional norms; and (2) that he was prejudiced

25   by counsel's deficient performance, *i.e.,* that "there is a reasonable probability that, but for

26   counsel's unprofessional errors, the result of the proceeding would have been different."

27   *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).  A reasonable probability is a

28                                          9

**United States District Court**
For the Northern District of California

probability sufficient to undermine confidence in the outcome. *Id.* A petitioner has the burden of showing through evidentiary proof that counsel's deficient performance caused him prejudice. *See Tomey v. Brunnell*, 898 F.2d 741, 743 (9th Cir. 1990). A petitioner can make out a claim of ineffective assistance of counsel only by pointing to specific errors made by trial counsel and by showing that these errors were not the result of reasonable professional judgment. *Strickland*, 466 U.S. at 690. A petitioner also must overcome a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment." *Id.* A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. *Id.* at 697; *see also Williams v. Calderon*, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) (approving district court's refusal to consider whether counsel's conduct was deficient after determining the petitioner could not establish prejudice).

**B.    Analysis**.

Upon review of Petitioner's ineffective assistance claims, this Court finds that Petitioner has not met his burden of establishing that his attorney's conduct fell below an objective standard or that Petitioner was prejudiced by the alleged deficiencies.

### 1.    Trial counsel was not ineffective for failing to retain a ballistics expert.

Petitioner asserts that his trial counsel was ineffective because he did not retain a ballistics expert to challenge the conclusions reached by the Prosecution's expert, Christopher Coleman ("Coleman"), who was called as a witness to support the Prosecution's theory that Petitioner aimed at the Barragans' car. (*See generally* Answer, Exhibit 11 (Reporters Transcript) at 292-357 (hereinafter "Tr. at __").) Counsel's failure to call an expert witness can be grounds for an ineffective assistance of counsel claim. *See, e.g., Schell v. Witek*, 218 F.3d 1017, 1028-29 (9th Cir. 2000) (counsel failed to solicit fingerprint expert where only evidence against defendant was a fingerprint); *Sims v. Livesay*, 970 F.2d 1575 (6th Cir. 1992) (finding trial counsel ineffective for failing to hire an expert to analyze bullet holes and powder patterns

10

1    on a quilt held by a homicide victim, at the time she was shot where, had an expert been

2    retained, the defendant may have been able to support his claim that the shooting was

3    accidental).

4         Petitioner argues that a ballistics expert could have supported his only theory of the

5    case, which was that Petitioner did not aim at the Barragans' car but rather shot blindly at the

6    car in self-defense and in response to Daniel pointing a gun at him.[5]  Petitioner also argues that

7    his proffered expert could have offered competing testimony to show that the testimony offered

8    by the Prosecution's expert was unreliable.  As evidentiary support for his claim, Petitioner

9    submits a declaration from Ken Moses, a forensic criminologist.  Mr. Moses declares that, if he

10   had testified at trial, he would have offered the opinion that Coleman's hypotheses were

11   scientifically unreliable, because Coleman failed to make certain measurements and calculations

12   and because Coleman failed to use an otoscope.  (Declaration of Ken Moses ("Moses Decl.") ¶¶

13   7-9, 13.)[6]  Further, Moses declares that he would have testified that, in his opinion, Petitioner

14   was not aiming and that the evidence more clearly supports a finding that Petitioner shot

15   blindly.  (*Id.* ¶ 12.)

16        Typically, a court must indulge a strong presumption that counsel's conduct falls within

17   the wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 689.  "[S]trategic

18   choices made after thorough investigation of law and facts relevant to plausible options are

19   virtually unchallengeable; and strategic choices made after less than complete investigation are

20   reasonable precisely to the extent that reasonable professional judgments support the limitations

21   on investigation."  *Id*. at 690-91.  However, if a record lacks any indicia that an attorney's

22   erroneous decision was tactical, the presumption that counsel's decisions were the result of

23   sound trial strategy may fade away.  *See United States v. Palomba*, 31 F.3d 1456, 1466 (9th Cir.

24

25        [5]    For clarity's sake, the Court shall refer to Daniel Barragan as "Daniel," to
     David Barragan as "David", and to the brothers collectively as "the Barragans."

26

27        [6]    The Moses Declaration is attached as Exhibit A to Petitioner's Amended
     Petition.

28

1994).  The Ninth Circuit has "not hesitated to find deficient performance" when the failure to present evidence is not based upon tactical considerations.  *Smith v. Stewart*, 140 F.3d 1263, 1269 (9th Cir. 1998).

Petitioner argues that trial counsel "candidly admitted his failure to call an expert was **not** a tactical decision."  (Memorandum in Support of Traverse ("Reply Br.") at 4) (emphasis in original).)  However, trial counsel did not state that he did not have a tactical reason for not calling a ballistics expert at all.  Rather, he states that his decision not to call *Mr. Moses* was not tactical.  (Declaration of Harry Robertson ("Roberston Decl.") ¶ 10 ("Had I known that Moses would have testified to this at trial if called, I would have called him to testify.  I had no tactical reason for not doing so.").)[7]  Trial counsel also states in his declaration "I did not call a defense expert on this point [patterns of bullet trajectories] and instead attacked Coleman's testimony through cross-examination."  (Robertson Decl. ¶ 7.)

Courts have found that a trial counsel's strategic decision to forgo calling an expert and to instead rely on cross-examination of the prosecution's witness does not render counsel ineffective.  By way of example, the Eighth Circuit affirmed a state court's finding that trial counsel was not ineffective for making a strategic choice to cross-examine the state's expert serologist, rather than calling a defense expert, to show that the defendant could not be pinpointed as the perpetrator of a sexual assault.  *Effelson v. Hopkins*, 5 F.3d 1149, 1150-51 (8th Cir. 1993); *see also Franklin v. Anderson*, 267 F. Supp. 2d 768, 780 (S.D. Ohio 2003) (finding counsel was not ineffective where counsel adequately challenged the prosecution's expert on cross-examination instead of calling defense expert witness), *aff'd* 434 F.3d 412 (6th Cir. 2006).  As discussed in more detail below, trial counsel's assertion is borne out by the record.  The Court concludes that his decision to forego calling an expert did not fall below reasonable standards of care.

---

[7]     The Robertson Declaration is attached as Exhibit D to Petitioner's Amended Petition for Writ of Habeas Corpus.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Even if the Court had concluded counsel was deficient, Petitioner's claim would fail

2 because he has not established prejudice.  As stated previously, prejudice occurs when "there is

3 a reasonable probability that, but for counsel's unprofessional errors, the result of the

4 proceeding would have been different."  *Strickland*, 466 U.S. at 694.  The Court must make this

5 determination by considering "the totality of the evidence before the judge or jury."  *Id.* at 695.

6 Where a state's case against a defendant is "weakly supported by the record" the outcome of the

7 defendant's case is "more likely to have been affected by the errors than one with

8 overwhelming record support."  *Id.* at 696.

9    The Prosecution introduced two witnesses who were on Story Road when the shooting

10 occurred.  One witness, Jose Alcala, saw a person in the backseat of Petitioner's car aiming

11 something at the Barragans' car, but could not identify what it was because he said it was

12 covered.  (Tr. at 399-400.)  The second witness, David Marichalar, heard the shots being fired,

13 but did not watch the shooting take place.  (*Id.* at 971-73.)  John Anaya, a defense witness, also

14 testified that he saw a passenger in Petitioner's car point something at the Barragans' car, and

15 that he did not see the Barragans aim anything or make any gestures at Petitioner's car.  (Tr. at

16 1163-65, 1179-80.)[8]  In contrast, Petitioner admitted that he fired the shots that killed David but

17 claimed that he fired blindly, after Daniel pointed a gun at Petitioner's car.  (Tr. at 1417-18.)

18 Petitioner was the only witness to testify that Daniel pointed a gun at him.

19    Moreover, in addition to Alcala's and Anaya's testimony, there was a significant amount

20 of other evidence to support the jury's verdict that Petitioner did act in or was not entitled to

21 claim self-defense.  For example, Sylvia Tapia, Petitioner's cousin, testified that she was aware

22 of bad blood between the Petitioner and Daniel.  (*Id.* at 671-72.)  She also testified that she

23 asked Petitioner to leave, because she did not want anything to happen at her home while here

24 children were there, but that he did not comply with her request.  (*Id.* at 683-85, 689-91.)

25 Furthermore, Tapia testified that when Petitioner began speaking to Daniel, an argument broke

26

27    [8]    Anaya testified that he thought the shooter was in the front passenger seat.
(Tr. at 1163.)

28

United States District Court

For the Northern District of California

out. Petitioner then challenged Daniel to a fight at a nearby school, but Daniel refused to fight Petitioner. (*Id.* at 691-92) Tapia testified that following this, she told Petitioner that Daniel was leaving town and would no longer be around San Jose. (*Id.* at 692.) According to Tapia's testimony, Petitioner's response was something along the lines of he would take care of Daniel then because he would not be able to see him anymore. (*Id.* at 693.)

Furthermore, Petitioner's trial counsel, during cross-examination of Coleman, was able to extract information that supported the defense theory of the case. For example, on cross-examination, Coleman stated that he was not biased and would consider the hypothetical questions posed by trial counsel. (Tr. at 314-15.) In response to one such question, the facts of which were parallel to the facts of the case, Coleman responded that the evidence could indicate either that the shots fired were fired by "somebody that's aiming deliberately trying to shoot at a particular point within the Honda [Petitioner's car] or within the Ford Escort [the Barragans' car], or you could have somebody who's just sticking the gun out the window and firing away at them." (Tr. at 334-35.) Coleman also was cross-examined on issues that Moses now says render Coleman's testimony unreliable, and thus the jury heard such testimony and could take that into account when it evaluated witness credibility. (*See, e.g.,* Tr. at 308-311 (by co-defense counsel), 314 (by co-defense counsel), 315-19 (by Petitioner's counsel).)

The Court concludes Petitioner has not met his burden of showing there is a reasonable probability that the outcome of the proceeding would have been different if trial counsel had introduced a rebuttal expert. Accordingly, the Court finds that Petitioner's trial counsel's failure to call a ballistics expert was neither deficient nor prejudicial and finds that the state court's application of clearly established federal law was not objectively unreasonable.

> **2.    Trial counsel was not ineffective for failing to retain a toxicology expert**.

Petitioner also contends that trial counsel was ineffective because he did not retain a toxicology expert to substantiate Petitioner's reasons for believing David was under the influence of PCP on the night of the shooting. Petitioner asserts that this constituted deficient performance by his trial counsel because the failure to call a toxicology expert impaired his

14

1    credibility.  As noted in the previous section, trial counsel may be deficient for failing to call an

2    expert witness.  *Schell*, 218 F.3d at 1028-29.

3         Petitioner testified that he believed David may have been under the influence of PCP.

4    (Tr. at 1407, 1490-91.)  Petitioner based this assumption on David's appearance and manner of

5    speech.  During cross-examination, the Prosecutor asked Petitioner whether he thought a person

6    on PCP could do things such as drive, park, walk, and talk.  (Tr. at 1490-91.)  These were all

7    things David did the evening of the shooting.  Petitioner's response to this question suggested

8    that it might be possible for a person on PCP to do all of these things.  (Tr. at 1491.)  Petitioner

9    argues that his trial counsel was ineffective for failing to call a toxicology expert who could

10   have verified his testimony.  As evidentiary support for this claim, Petitioner submits a

11   declaration from Raymond C. Kelly, a forensic toxicologist.  Dr. Kelly avers that he could have

12   testified about the types of symptoms a person on PCP would manifest and also could have

13   testified that David could have driven, walked, parked, and talked despite the presence of PCP

14   in his system.  (Declaration of Raymond C. Kelly ("Kelly Decl.") ¶¶ 5,7, and 9.)[9]

15        Again, this Court must indulge a strong presumption that counsel's conduct falls within

16   the wide range reasonable professional assistance.  *Strickland*, 466 U.S. at 689.  Trial counsel

17   made numerous efforts to introduce David's autopsy report, which showed that David had PCP

18   in his system.  (Tr. at 940-43.)  Trial counsel's efforts to demonstrate the report's relevance to

19   the case proved futile.  (*Id.*)  Petitioner's trial counsel states that he considered calling an expert

20   to give testimony as to the effects of PCP.  (*See* Robertson Decl. ¶¶ 11, 13.)  Trial counsel,

21   however, decided not to procure an expert because the trial court excluded David's autopsy

22   report.  (*Id.* ¶ 13.)  An attorney is not ineffective for failing to undertake futile efforts on behalf

23   of his client.  *See James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1999) ("Counsel's failure to make a

24   futile motion does not constitute ineffective assistance of counsel.").  Given trial counsel's

25   unsuccessful efforts to introduce the report, his reason for not calling a toxicology expert shows

26

27

28        [9]    The Kelly Declaration is attached as Exhibit B to Petitioner's Amended
     Petition.

United States District Court

For the Northern District of California

that his decision falls within the wide range of reasonable professional assistance.  Accordingly, Petitioner has failed to meet his burden to establish the first prong of the *Strickland* test.

Moreover, even if the Court found this decision by trial counsel was deficient, Petitioner's claim would not succeed because he has failed to establish prejudice.  The trial court noted that Petitioner's state of mind, rather than David's, would be relevant to Petitioner's trial.  (Tr. at 942.)  Petitioner testified that he and *Daniel* agreed to fight; not that he and *David* agreed to fight.  Thus, the only other person whose state of mind might have been relevant to Petitioner's self-defense theory would have been Daniel.  "Even assuming the existence of a duty to find evidence that bolsters a key witness' credibility by corroborating irrelevant facts in his testimony, [when] such evidence is so loosely tied to the defense . . . its absence would not undermine confidence in the outcome."  *Hendricks v. Calderon*, 70 F.3d 1032, 1040-41 (9th Cir. 1995) (citing *Strickland*, 466 U.S. at 694).  The lack of a witness whose testimony might have served to bolster Petitioner's testimony on an issue with little or no relation to Petitioner's self-defense theory is unlikely to have altered the outcome in this case, and Petitioner has not satisfied the prejudice prong required under *Strickland*.

Accordingly, the Court concludes that Petitioner's trial counsel's failure to call a toxicology expert was neither deficient nor prejudicial and finds that the state court's application of clearly established federal law was not objectively unreasonable.

### 3.    Trial counsel was not ineffective for failing to call Dagnino as a witness.

Finally, Petitioner contends that trial counsel was ineffective, because he did not call Petitioner's co-defendant, Johnny Dagnino, as a witness.  Petitioner argues that Dagnino could have offered testimony to substantiate the fact Daniel pointed a gun at Petitioner, and his co-defendants, before the shooting occurred.  As evidence, Petitioner submits a declaration, in which Dagnino avers that, on the night of the shooting, he saw Daniel lift his hand and brandish a revolver.  (Declaration of Johnny Dagnino ("Dagnino Decl.") ¶¶ 5, 6.)[10]

---

[10]    The Dagnino Declaration is attached as Exhibit C to Petitioner's Amended Petition.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Trial counsel avers that he did not call Dagnino to testify because he assumed, correctly,

2    that Dagnino would invoke his Fifth Amendment privilege against self-incrimination.

3    (Robertson Decl. ¶ 5.)  It is within the ambit of reasonable professional judgment for trial

4    counsel to refrain from calling a witness whom counsel reasonably assumes will invoke his or

5    her Fifth Amendment privilege.  For example, in *United States v. Harden*, 846 F.2d 1229 (9th

6    Cir. 1999), the court denied an ineffective assistance claim for trial counsel's failure to call a

7    witness who had a Fifth Amendment right not to testify and who had credibility problems

8    because he was a convicted felon.  *Harden*, 846 F.2d at 1231-32.  The *Harden* court reasoned

9    that there was no evidence in the record to indicate that the particular witness would testify and

10   that the witness' credibility issues made it a reasonable trial tactic to not call him.  *Id.*

11   Similarly, in this case, there is no evidence in the record to suggest that Dagnino would have

12   testified at trial.  Further, Dagnino had significant credibility issues.  He too was on trial for

13   conspiracy to commit murder, and the jury heard evidence that Dagnino only drove stolen cars.

14   (*See* Answer, Ex. 4 at 7.)  Thus, trial counsel's decision to not call Dagnino to testify does not

15   establish that his performance fell below objective standards of reasonableness.

16   Even if Petitioner was able to establish that counsel's performance was deficient, he

17   would be unable to establish prejudice.  To establish prejudice caused by the failure to call a

18   witness, Petitioner must show that "the witness was likely to have been available to testify; that

19   the witness would have given the proffered testimony; and that the witnesses' testimony would

20   have created a reasonable probability that the jury would have reached a verdict more favorable

21   to the Petitioner."  *Mitchell v. Ayers*, 309 F. Supp. 2d 1146, 1155 (N.D. Cal. 2004) (citing

22   *Alcala v. Woodford*, 334 F.3d 862, 872-73 (9th Cir. 2003)).  Petitioner has failed to demonstrate

23   any of these requirements.  Dagnino does not state that he would have testified on behalf of the

24   Petitioner.  Furthermore, even if Dagnino had been available to testify and would have given the

25   proffered testimony, Petitioner has failed to demonstrate that Dagnino's testimony would have

26   created a reasonable probability that the jury would have reached a verdict more favorable to

27   the Petitioner.  Testimony from someone, other than Petitioner, asserting that they saw Daniel

28   point a gun at the defendants' car may have been useful to Petitioner.  However, as stated

17

1    above, Dagnino had significant credibility issues and had ties to Petitioner.  Given the other

2    evidence in the record, discussed in Section I.B.1, *supra*, Petitioner cannot show that Dagnino's

3    testimony would have created a reasonable probability that the jury would have reached a

4    verdict more favorable to him.  Thus, Petitioner is unable to establish prejudice.

5            Accordingly, the Court concludes that Petitioner's trial counsel's failure to Dagnino as a

6    witness was neither deficient nor prejudicial and finds that the state court's application of

7    clearly established federal law was not objectively unreasonable.[11]

8                    **4.        Dagnino's declaration does not constitute new evidence**.

9            Conceding that Dagnino's Fifth Amendment privilege not to testify might preclude an

10   ineffective assistance of counsel claim, Petitioner argues, in the alternative, that Dagnino's

11   declaration constitutes new evidence.  "Newly discovered evidence is a ground for federal

12   habeas relief only when it bears on the constitutionality of an appellant's conviction" and only

13   when it would probably result in an acquittal.  *See Swan v. Peterson*, 6 F.3d 1373, 1384 (9th Cir.

14   1993) (citing *Herrera v. Collins*, 506 U.S. 390, 400, 417 (1993); *Harris v. Vasquez*, 949 F.2d

15   1497, 1523 (9th Cir. 1990)).  Dagnino's declaration does not constitute newly discovered

16   evidence.  When a "defendant who has chosen not to testify subsequently comes forward to

17   offer testimony exculpating a co-defendant, the evidence is not newly discovered."  *United*

18   *States v. Diggs*, 649 F.2d 731, 740 (9th Cir. 1991).[12]  Although Dagnino's testimony is "newly

19   available" to Petitioner, this evidence is not newly discovered.  *See United States v. Lockett*,

20   919 F.2d 585, 591 (9th Cir. 1990).  Thus, Petitioner is not entitled to habeas relief based on

21

22    _____

23        [11]    Petitioner correctly contends that prejudice *may* result from the cumulative
      impact of multiple deficiencies.  *See Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995).
24    However, this Court does not need to address whether prejudice resulted from the cumulative
      impact of deficiencies in Petitioner's case.  This is because Petitioner failed to meet his
25    burden of establishing that his trial counsel's performance was deficient.  Thus, Petitioner's
      case is unlike *Harris*, where the court found Harris's trial counsel's performance was
26    deficient in eleven ways and was therefore "compelled to find that [the deficiencies]
      cumulatively prejudiced Harris's defense."  *Id.*  Again, the state court's application of clearly
27    established federal law was not objectively unreasonable.

28        [12]    *Diggs* was overruled on other grounds by *United States v. McConney*, 728
      F.2d 1195 (9th Cir. 1984).  *See United States v. Ibarra-Alcarez*, 830 F.2d 968, 973 n.1 (9th
      Cir. 1987).

1   newly discovered evidence, and the state court's application of clearly established federal law

2   was not objectively unreasonable.

3   **II.     Claim Two.**

4          Petitioner's second claim relates to the trial court's refusal to allow his investigator to sit

5   at the defense table and the trial court's limitations with respect to trial counsel's

6   communications with his investigator.  Before the trial began, Petitioner's trial counsel asked

7   the court for permission to allow his defense investigator, Anne Fields ("Fields"), to sit at the

8   defense table.  To support his request, Petitioner's trial counsel stated that Fields knew the case

9   and was the only person to have interviewed the witnesses. (Tr. at 14-16.)  The trial court

10  denied that request, but Fields was permitted to sit in the court audience. (*Id.* at 14.)  Petitioner

11  contends that his trial counsel twice asked the court for permission to speak with Fields while

12  she sat in the audience but contends that the Court refused both requests. (Reply Br. at 16.)

13         Petitioner argues that these actions by the trial court violated Petitioner's right to the

14  effective assistance of counsel because "[d]uring the critical cross-examinations of prosecution

15  witnesses Daniel Barragan and Ricardo Villa, defense counsel was forced to abandon important

16  lines of questioning because counsel was unable to consult with [Fields] . . . the only person on

17  the defense team who had actually spoken to the witnesses." (Memorandum in Support of

18  Amended Petition ("Pet. Br.") at 51.)  Petitioner asserts this "fundamentally undercut counsel's

19  ability to present a case on petitioner's behalf." (*Id.* at 52.)

20         Petitioner further argues that these actions violated his constitutional rights to due

21  process and a fair trial, because the trial court allowed the state's investigator to sit at counsel's

22  table and to confer with the prosecution, thereby leading to disparate treatment between the

23  prosecution and the defense.

24  **A.     Legal Standard.**

25         "[T]he right to the assistance of counsel has been understood to mean that there can be

26  no restrictions upon the function of counsel in defending a criminal prosecution in accord with

27  the traditions of the adversary factfinding process that has been constitutionalized in the Sixth

28  and Fourteenth Amendments." *Herring v. New York*, 422 U.S. 853, 857 (1975).  This right may

United States District Court

For the Northern District of California

19

United States District Court

For the Northern District of California

1    be violated if restrictions placed on counsel's functions preclude counsel from providing his or

2    her client with the representation to which the client is constitutionally entitled. *See Strickland*,

3    466 U.S. at 686.  A defendant's right to the effective assistance of counsel "has thus been given

4    a meaning that ensures to the defense in a criminal trial the opportunity to participate fully and

5    fairly in the adversary factfinding process." *Herring*, 422 U.S. at 858.

6         While the Constitution "defines the basic elements of a fair trial largely through the

7    several provisions of the Sixth Amendment," it also "guarantees a fair trial through the Due

8    Process Clauses." *Strickland*, 466 U.S. at 684-85.  The due process clause "speak[s] to the

9    balance of forces between the accused and his accuser." *Wardius v. Oregon*, 412 U.S. 470, 474

10   (1973).  Some imbalance of forces between the accused and his accuser may be contrary to due

11   process. *See id.*  However, a lack of symmetry does not necessarily render a trial unfair. *See*

12   *United States v. Turkish*, 623 F.2d 769, 774 (2nd Cir. 1980) ("A criminal trial, unlike a civil trial,

13   is in no sense a symmetrical proceeding.").

14       **B.    Analysis.**

15           **1.    The trial court did not interfere with Petitioner's right to the
             effective assistance of counsel.**

16

17       A trial court may violate "the right to effective assistance when it interferes in certain

18   ways with the ability of counsel to make independent decisions about how to conduct the

19   defense." *See Strickland*, 466 U.S. at 686 (citing cases).  For example, the Supreme Court has

20   held that a trial court's "order preventing petitioner from consulting his counsel 'about

21   anything' during a 17-hour overnight recess between his direct- and cross-examination

22   impinged upon his right to the assistance of counsel guaranteed by the Sixth Amendment."

23   *Geders v. United States*, 425 U.S. 80, 91 (1976).  Similarly, the Ninth Circuit found a habeas

24   petitioner was entitled to relief where an order given by the trial court prevented the petitioner

25   from arguing his theory of the defense in closing argument. *See Conde v. Henry*, 198 F.3d 734,

26   739 (9th Cir. 2000).  The *Conde* court reasoned that "'closing argument for the defense is a basic

27   element of the adversary fact-finding process in a criminal trial'" and as such "denying an

28

United States District Court

For the Northern District of California

1    accused the right to make final arguments on his theory of the defense denies him the right to

2    assistance of counsel." *Id.* at 739 (citing *Herring*, 422 U.S. at 858, 865).

3         Here, the trial court's refusal to allow Fields to sit at defense table did not interfere with

4    trial counsel's ability to present a case on Petitioner's behalf; nor did this restriction prevent

5    trial counsel from assisting Petitioner during critical stages of the trial.  Unlike the petitioner's

6    trial counsel in *Conde* who, because of the trial court's order, was barred completely from

7    arguing his theory of the defense during closing arguments, the trial court in Petitioner's case

8    did not interfere with trial counsel's abilities to present a defense and contest the Prosecution's

9    case.  Trial counsel knew before trial that Fields would not be permitted to sit at counsel's table.

10   After learning Fields could not sit at counsel table during trial, trial counsel had over six weeks

11   to prepare for the cross-examination of Daniel and Ricardo Villa.[13]  Furthermore, there is no

12   evidence in the record to indicate that the trial court prevented trial counsel from conferring

13   with Fields prior to the commencement of the trial.  Nor is there any evidence that the trial court

14   interfered with counsel's ability to communicate by Fields by means other than speaking to her

15   while she sat in the audience.

16        Accordingly, the Court concludes that the trial court did not interfere with Petitioner's

17   right to the effective assistance of counsel and finds that the state court's application of clearly

18   established federal law was not objectively unreasonable.

19        **2.    The trial court did not violate Petitioner's due process right to parity with
            the state.**

20

21        Petitioner contends that the trial court violated his due process rights to parity with the

22   Prosecution, when the trial court allowed the Prosecution's investigator to sit at counsel table

23   but refused to allow Petitioner's investigator to do the same.  The Court of Appeal rejected that

24   argument and reasoned that the different treatment of the prosecution and the defense did not

25   violate Petitioner's right to due process, because the seating arrangement merely was the result

26   of "the number of people already at counsel table."  The Court of Appeal noted that it was well

27

28   _____
     [13]      The trial court ruled that Fields could not sit at counsel table on December 1,
     1998.  (Tr. at 1, 14-16.)  The state called Daniel as a witness on January 14, 1999, and called
     Ricardo Villa as a witness on January 19, 1999.  (*Id.* at 255, 358, 452, 567.)

1   within the discretion of the trial court to limit the number of people at defense's table.  (Answer,

2   Ex. 4 at 28.)

3          Although the Petitioner was not constitutionally entitled to have the defense's

4   investigator seated at counsel table, the constitutional inquiry does not end here.  For example,

5   in *Wardius*, the Supreme Court held that even though defendants do not have a constitutional

6   right to pre-trial discovery, the defendant was denied due process because, under an Oregon

7   statute, the defendant was required to provide alibi information before the trial and there was

8   not a reciprocal discovery obligation imposed on the state.  *Wardius*, 412 U.S. at 474-76.  In

9   reaching its holding, the Supreme Court stated, "[a]lthough the Due Process Clause has little to

10  say regarding the amount of discovery which the parties must be afforded ... it does speak to the

11  balance of forces between the accused and the accuser."  *Id.* at 474.  The Court found that

12  although due process did not require Oregon to adopt any pre-trial discovery provisions, if it

13  did, "discovery must be a two way street."  *Id.* at 475.  Thus, *Wardius* illustrates that at least

14  some rights afforded to the accuser must also be extended to the accused.

15         However, due process does not always require absolute reciprocity of the rights granted

16  to the defense and the prosecution.  *See Turkish*, 623 F.2d at 774.  "A criminal prosecution,

17  unlike a civil trial, is in no sense a symmetrical proceeding."  *Id.*  Instead the accused and

18  accuser have different rights and obligations that are intended to create an overall balance to

19  achieve a fair trial.  *Id.* at 774-75.  In this case, the trial court's decision did not did not upset the

20  balance of power between the Petitioner and the Prosecution in a manner contrary to due

21  process clause of the Fifth Amendment.  As stated in Section II.B.1, *supra*, trial counsel had

22  more than ample opportunity to gain the information he needed from the defense investigator.

23  There is also no evidence in the record that demonstrates the Prosecution gained an advantage

24  by having its investigator at counsel table.  Furthermore, trial courts have a duty and significant

25  interest in preserving order, dignity, and decorum during court proceedings.  *See King v.

26  Rowland*, 977 F.2d 1354, 1357 (9th Cir. 1992).  The record demonstrates that the trial court

27  believed Fields would crowd counsel table.  (Tr. at 14-16.)

28

United States District Court
For the Northern District of California

22

United States District Court

For the Northern District of California

1    Accordingly, the Court finds that the trial court did not interfere with Petitioner's right

2    to the effective assistance of counsel and did not violate Petitioner's due process rights.  The

3    state court's application of clearly established federal law was not objectively unreasonable.

4    **III.    Claim Three**.

5    In his third claim for relief, Petitioner contends that the trial court violated his federal

6    rights to due process and to present a defense, because the trial court did not instruct the jury on

7    the defense theory of the case and "left the jury with no choice but to convict of murder."  (Pet.

8    Br. at 35.)  The Court of Appeal rejected this claim, finding no constitutional violation.

9    (Answer, Ex. 4 at 8-12.)

10    **A.    Legal Standard**

11    "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present

12    a complete defense.'"  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v.*

13    *Trombetta*, 467 U.S. 479, 485 (1984)).  "It [also] is well established that a criminal defendant is

14    entitled to adequate instructions on the defense theory of the case."  *Conde*, 198 F.3d at 739

15    (finding it was error to deny defendant's request for instruction on simple kidnapping where

16    such instruction was supported by the evidence).  Failure to instruct on the theory of defense

17    violates due process if "'the theory is legally sound and evidence in the case makes it

18    applicable.'"  *Clark v. Brown*, 450 F.3d 898, 904-05 (9th Cir.2006) (quoting *Beardslee v.*

19    *Woodford*, 358 F.3d 560, 577 (9th Cir. 2004)).  However, a defendant is not entitled to have jury

20    instructions raised in his or her precise terms where the given instructions adequately embody

21    the defense theory.  *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996); *United*

22    *States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979).

23    The Supreme Court has explained its view that "the cases in which [it has] invoked this

24    principle dealt with the exclusion of evidence ... or the testimony of defense witnesses. ... None

25    of them involved restrictions imposed on a defendant's ability to present an affirmative

26    defense."  *Gilmore v. Taylor*, 508 U.S. 333, 343 (1993).  The *Gilmore* court also reiterated the

27    general principle that "instructional errors of state law generally may not form the basis for

28    federal habeas relief."  *Id*. at 344 (citing *Estelle v. McGuire*, 502 U.S. 62 (1991)).  Similarly, "a

United States District Court

For the Northern District of California

1   state trial court's refusal to give an instruction does not alone raise a ground cognizable in a

2   federal habeas corpus proceeding." *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988).

3   Rather, the error must so infect the entire trial that the defendant was deprived of his or her right

4   to a fair trial guaranteed by the due process clause of the Fourteenth Amendment.

5           To determine if a constitutional violation has occurred, a court must look to "the

6   evidence in the case and the overall instructions given to the jury." *Duckett v. Godinez*, 67 F.3d

7   734, 745 (9th Cir. 1995) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Due process does

8   not require that an instruction be given unless the evidence supports it. *See Hopper v. Evans*,

9   456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005).  "'An

10  omission, or an incomplete instruction is less likely to be prejudicial than a misstatement of the

11  law.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson v. Kibbe*,

12  431 U.S. 145, 155 (1977)).  "[T]hus, a habeas petitioner whose claim involves a failure to give a

13  particular instruction bears an 'especially heavy burden.'" *Id.* (quoting *Henderson*, 431 U.S. at

14  155).  The significance of the omission of such an instruction may be evaluated by comparison

15  with the instructions that were given. *Murtishaw v. Woodford*, 255 F.3d 926, 971-72 (9th Cir.

16  2001) (quoting *Henderson*, 431 U.S. at 156).

17          **B.      Analysis**

18          Petitioner's claim focuses on the fact that the trial court gave CALJIC 5.56, which

19  provides that a person engaged in mutual combat has a duty to retreat before he or she may

20  claim self defense and refused to give a modification to that instruction, which would have

21  negated the duty to retreat.  (*See* Pet. Br. at 34.)  Petitioner claims that this effectively negated

22  his self-defense claim, thereby violating his due process rights.  The Court disagrees.  Although

23  couched in due process terms, it appears to the Court that Petitioner's true complaint is that the

24  instructions that were given were erroneous.  That does not entitle him to federal habeas relief.

25  Petitioner was not prevented from arguing his theory of defense to the jury, and there is no

26  dispute that the jury was instructed on the law of self-defense.  (*See* Tr. at 1658-1659, 1660,

27  1661-62.)

28

1    Moreover, the jury was explicitly instructed that the mutual combat instruction applied

2    only to "a fight begun or continued by mutual prearrangement, agreement or consent."  (Tr. at

3    1662.)  The jury was also instructed that a person may not claim self-defense if they "seek[] a

4    quarrel with the intent to create a real or apparent necessity of exercising self-defense."  (*Id.*)

5    Finally, the jury was also instructed that self-defense was a defense to the charges if it was

6    "necessary under the circumstances for him to use in self-defense force or means that might

7    cause the death of the other person for the purpose of avoiding death or great bodily injury to

8    himself."  (*Id.* at 1658.)  Although Petitioner notes that the jury did send notes regarding the law

9    of self-defense, none of the questions related to the mutual combat instruction.  (*See* Exhibit 12,

10   Clerk's Transcript, at 574.)  Considering these instructions in conjunction with the evidence

11   presented, this Court cannot conclude that the jury was, as Petitioner contends, left with no

12   choice but to convict him of murder, *i.e.* Petitioner was not deprived of his ability to present his

13   theory of the defense.  Thus, the Court concludes that the state court's application of clearly

14   established federal law was not objectively unreasonable.

15   **IV.   Claim Four.**

16   Petitioner's fourth claim asserts a Due Process violation based on the fact that the

17   Prosecutor called Petitioner's credibility into question, relying on the absence of evidence that

18   the Prosecutor had asked to be excluded.  Petitioner argues that this amounts to prejudicial

19   prosecutorial misconduct.  Because there is no reasoned decision on this claim, the Court has

20   conducted an independent review of the record.

21   **A.   Legal Standard.**

22   A defendant's due process rights are violated when a prosecutor's misconduct renders a

23   trial "fundamentally unfair."  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *accord*

24   *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of

25   alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the

26   prosecutor").  To prevail on such a claim, a petitioner must demonstrate that "the prosecutors'

27   comments 'so infected the trial with unfairness as to make the resulting conviction a denial of

28   due process.'"  *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643

**United States District Court**
For the Northern District of California

(1974)).  Under *Darden*, the first issue a court must address is whether the prosecutor's remarks were improper.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).  If the answer to that question is yes, a court then addresses whether the remarks infected the trial with unfairness. *Id.*

**B.      Analysis.**

The first question the Court addresses is whether the Prosecutor's remarks were improper.  Pertinent to this question is the fact that Petitioner's trial counsel attempted to introduce evidence that David was on PCP at the time of the shooting.  (Tr. at 940-43.)  The Prosecution argued that this evidence was irrelevant and should not be admitted.  (Tr. at 942-43.)  The trial court "exclud[ed] the information regarding the trace amount of PCP and the [PCP] cigarette found on the victim's body."  (Tr. at 943.)  Notwithstanding this ruling, Petitioner testified on direct examination that he believed David was under the influence of PCP the night of the shooting because of the way he (David) looked.  (Tr. at 1407.)  On cross-examination, the Prosecutor asked Petitioner a series of questions directed to Petitioner's opinion of whether a person under the influence of PCP could drive, park, walk, and talk, all of which were activities in which David undisputably engaged on the night of the shooting.  (Tr. at 1490-91.)  Petitioner responded to these questions by stating that whether or not a person on PCP could do all these things would likely depend on the amount of PCP in his system.  (Tr. at 1491.)  Petitioner also stated that he thought David was under the influence of PCP because of "his eyes" and "the way he was talking."  Petitioner admitted, however, that he was not "positive" about this.  (*Id.*)

As a criminal defendant, Petitioner was not required to testify.  After choosing to do so, he opened himself up to cross-examination on any matters reasonably related to his direct testimony.  *Brown v. United States*, 356 U.S. 148, 155-56 (1958); *United States v. King*, 200 F.3d 1207, 1216-17 (9th Cir. 1999).  The Prosecutor's questions did relate to Petitioner's direct testimony.  However, the Court concludes that those questions were improper.  When a prosecutor has a good faith belief that certain evidence may be true, he or she may ask the jury to draw inferences from such evidence.  *United States v. Blueford*, 312 F.3d 962, 968 (9th Cir.

26

2002).  Such conduct is fair advocacy.  *Id.*  When a prosecutor, however, asks the jury to draw

an inference about a defense witness's believability from facts he "knows to be false, or has

very strong reason to doubt," he may run afoul of the bounds of fair advocacy and engage in

improper conduct.  *Id.*  Upon a close review of the questions that Petitioner alleges were

improper, the Court finds the Prosecutor did more than merely ask Petitioner questions related

to his direct testimony.  The Prosecutor asked the Petitioner numerous questions about David's

PCP use, until Petitioner finally declared that it was possible that David was not under the

influence of PCP.  The Prosecutor, however, knew David had PCP in his system, and it was

improper for the prosecution to imply that he was relying on facts he knew to be untrue.  *See id.*

(citing *United States v. Udechukwu*, 11 F.3d 1101, 1106 (1st Cir. 1993)).

     The next inquiry is whether the Prosecutor's improper questions so infected the trial

with unfairness as to violate Petitioner's due process rights.  In resolving that question, a court

may consider whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v.*

*Sunn*, 807 F.2d 805, 809 (9th Cir. 1987), and also may consider whether the misconduct relates

to a critical part of the case.  *See Giglio v.United States*, 405 U.S. 150, 154 (1972) (failure to

disclose information showing potential bias of witness was especially significant because

government's case rested on credibility of that witness).  The Court finds no due process

violation in this case.  The line of questioning regarding David's PCP use are the only facts

relied on by the Petitioner to show that the Prosecutor engaged in misconduct in a trial that

lasted nearly four weeks.[14]  "Where an allegedly improper question is an isolated or one-time

incident, [the Ninth Circuit] consistently has refused to find a due process violation."  *See Ortiz*

*v. Stewart*, 149 F.3d 923, 934-35 (9th Cir. 1998) (citing cases).  In addition, the Prosecutor's

questions did not relate to a critical part of the case.  Whether or not *David* had a trace amount

of  PCP in his system was not relevant to whether or not the Petitioner fired in self-defense

because he thought *Daniel* was shooting at him.  Thus, the Court concludes that the challenged

───────────────

[14]     On appeal, Petitioner raised another incident and also contended that the
Prosecutor's conduct was improper.  (*See* Answer, Ex. 4 at 29-30.)  Petitioner, however, has
not brought any facts to this Court's attention to support a pattern of misconduct by the
prosecution.

1   line of questioning did not so infect Petitioner's trial with unfairness as to deprive Petitioner of

2   due process, and the state court's application of clearly established federal law was not

3   objectively unreasonable.

4   **V.      Claim Five.**

5        In his fifth claim, Petitioner contends he is entitled to habeas relief because the trial

6   court violated his right to a public trial and his right to procedural due process when it closed

7   the courtroom to the public while part of his testimony was being reread to the jury.  The last

8   reasoned decision is the Court of Appeal's decision affirming Petitioner's conviction.

9        **A.      Legal Standard.**

10       The Sixth Amendment guarantees a criminal defendant the right to a public trial.  U.S.

11  Const. amend. VI.  This right is applicable to the states through the Fourteenth Amendment.

12  *See In re Oliver*, 333 U.S. 257, 273 (1948).  The public trial guarantee was created for the

13  benefit of defendants.  *See Waller v. Georgia*, 467 U.S. 39, 46 (1984).  It discourages perjury

14  and ensures that judges, lawyers, and witnesses carry out their respective functions responsibly.

15  *See id.*; *Oliver*, 333 U.S. at 270 & n.25.  Open court proceedings may also "improve the quality

16  of testimony, induce unknown witnesses to come forward with relevant testimony, cause all

17  trial participants to perform their duties more conscientiously, and generally give the public an

18  opportunity to observe the judicial system."  *Gannett Co. v. DePasquale*, 443 U.S. 368, 383

19  (1979) (citing *Estes v. Texas*, 381 U.S. 532, 583 (1965) (Warren, C.J., concurring)).  The right

20  to a public trial is not absolute, however, and must give way in some cases to other interests

21  essential to the fair administration of justice.  *See Waller*, 467 U.S. at 45.  There must be an

22  affirmative act by the trial court meant to exclude persons from the courtroom for there to be a

23  denial of a defendant's Sixth Amendment right to a public trial.  *United States v. Shyrock*, 342

24  F.3d 948, 974 (9th Cir. 2003).

25       Petitioner's claim is based on a partial or limited closure of his trial.  In such instances, a

26  trial judge must provide a substantial reason for the closure, and the scope of the closure must

27  have been narrowly tailored.  *United States v. Sherlock*, 962 F.2d 1349, 1357 (9th Cir. 1989).  In

28  addition, the court must: (1) provide defendant with an opportunity to be heard; (2) make

United States District Court

For the Northern District of California

28

1  factual findings to support the partial closure; and (3) consider reasonable alternatives to the

2  partial closure. *See id.* at 1357-59. The exclusion of spectators during a witness's testimony to

3  protect the witness or to maintain order generally has been deemed justified. *See, e.g.,*

4  *Sherlock*, 962 F.2d at 1357 (to protect minor from embarrassment of testifying before giggling

5  family members); *United States v. Akers*, 542 F.2d 770, 772 (9th Cir. 1976) (to avoid disorder).[15]

6               **B.       Analysis.**

7               The Court of Appeal held that the trial court's decision to close the courtroom to the

8  public during the readback of Petitioner's testimony did not violate Petitioner's constitutional

9  right to a public trial. That court reasoned that Petitioner had not established that he had right to

10  have the public present at that stage of the proceedings, after it considered relevant case law, the

11  purpose and nature of the readback procedure, and the manner in which the readback procedure

12  is treated. (Answer, Ex. 4 at 35.) The Supreme Court has not specifically addressed whether

13  the rereading of testimony is included in the definition of a public trial. Accordingly, the Court

14  of Appeal's decision cannot be directly "contrary" to Supreme Court precedent. *See Fisher v.*

15  *Roe*, 263 F.3d 906, 915 (9th Cir. 2001), *overruled on other grounds Payton v. Woodford*, 346

16  F.3d 1204, 1217 n.18 (9th Cir. 2003). This, however, does not end the inquiry into Petitioner's

17  claim. If the Court of Appeal "unreasonably refuse[d] to extend [an established legal principle]

18  to a new context where it should apply," Petitioner would be entitled to relief. *Fisher*, 263 F.3d

19  at 915 (brackets in original) (quoting *Williams*, 529 U.S. at 398).

20               Relying on *Waller v. Georgia*, 467 U.S. 39 (1984) and *Press-Enterprise Co. v. Superior*

21  *Court*, 464 U.S. 501 (1984), Petitioner argues that the right to a public trial extends to the

22  rereading of witness testimony after the jury has retired to deliberate. The Court finds that

23  neither of these cases support an inference that the right to a public trial extends to the rereading

24  of witness testimony. In *Press-Enterprise*, the Supreme Court held that the presumption of

25  openness to the public in criminal proceedings extends to the voir dire process. *Press-*

26  *Enterprise*, 464 U.S. at 505-06, 510. Although the Court addressed the issue under the First

27  _____

28         [15]      *See also United States v. Eisner*, 533 F.2d 987, 993-94 (6th Cir. 1976) (to
   protect witness with fear of testifying in public); *United States ex rel. Orlando v. Fay*, 350
   F.2d 967, 971 (2d Cir. 1965) (to maintain order in courtroom).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Amendment, the Court reasoned that the presumption of openness extends to jury selection not

2    only because criminal defendants have had the right to challenge and select jurors in open court

3    for hundreds of years but because the purpose of voir dire is to "ensure a fair impartial jury."

4    *Id.* at 508-09, 511.  The Court determined that closing this process to the public would

5    undermine confidence in jury selection outcomes and the basic fairness of the criminal trial

6    would be denied.  *Id.*  The Court also held that the presumption of an open proceeding may be

7    overcome "based on findings that closure is essential to preserve higher values and is narrowly

8    tailored to serve that interest."  *Id.* at 511; *see also Waller*, 467 U.S. at 48 ("Under *Press-*

9    *Enterprise*, the party seeking to close the hearing must advance an overriding interest that is

10   likely to be prejudiced, the closure must be no broader than necessary to protect that interest,

11   the trial court must consider reasonable alternatives to closing the proceeding, and it must make

12   findings adequate to support the closure.").

13          In *Waller*, the Supreme Court held "that under the Sixth Amendment any closure of a

14   suppression hearing over the objections of the accused must meet the test set out in *Press-*

15   *Enterprise* and its predecessors."  *Waller*, 467 U.S. at 47.  In reaching its conclusion, the

16   Supreme Court noted that suppression hearings "often resemble a bench trial."  *Id.*  Thus, the

17   "aims and interests" which support the public trial right, *i.e.*, to ensure that the judge and the

18   prosecutor carry out their duties responsibly, to encourage witnesses to come forward, and to

19   discourage perjury, "are no less pressing in a hearing to suppress wrongfully seized evidence."

20   *Id.*  These cases do not lead to the inescapable conclusion that the public has a right to attend

21   the readback of testimony once the jury has retired to deliberate.  Rather, *Waller* and *Press*

22   *Enterprise* set forth the procedures and principles to be applied before a proceeding is closed.

23          Petitioner also relies heavily on *Fisher* and contends that case stands for proposition that

24   rereading of witness testimony is a critical stage of the trial process.  (Pet. Br. at 69).  Petitioner

25   then posits that if a defendant has the right to be present at critical stages of a criminal trial, a

26   defendant should also have the right to have the public present during readback.  Petitioner's

27   argument is not persuasive.

28

United States District Court

For the Northern District of California

In the *Fisher* case, the jury asked the court reporter to read back portions of the trial testimony relating to the time line of the crime in question, which one of the jurors noted was the key issue for them in determining the defendants' guilt. *Fisher*, 263 F.3d at 910-11.  Fisher subsequently sought habeas relief claiming that he was not notified of the jury's request, that he was not present during the readback, and that the judge also was not present to supervise the proceedings. *Fisher*, 263 F.3d at 910.  The district court granted Fisher's habeas petition on this ground, and the Ninth Circuit affirmed.

The Ninth Circuit noted that the Supreme Court had not addressed this specific issue, and thus the state court decision did not "directly contradict a factually indistinguishable Supreme Court case." *Id.* at 915.  However, the court noted that "[t]he Supreme Court has ... set forth a working constitutional standard by which to evaluate whether a defendant has a right to participate in a particular proceeding." *Id.* at 914.  Applying that standard, the *Fisher* court determined that, under the unique circumstances of defendant Fisher's trial, Fisher had the right to be present during the readback "if [his] absence could have undermined the fairness of the proceedings." *Id.* at 915.  Because the readback "occurred not only in the absence of the defendants and their lawyers, but without their knowledge and participation," and because the trial judge was not present to supervise the procedure, the Ninth Circuit found that Fisher's presence "could have made certain, where appropriate, that testimony of defense witnesses was read as well as that of the state's witnesses.  They could also have ensured that any cross-examination of prosecution witnesses would be read in addition to direct testimony.  They could also have made certain that the court reporter's notes were accurate, that the notes accurately reflected the witnesses' testimony, and that she did not unduly emphasize any part of the requested testimony or use any improper voice inflections." *Id.* at 916.  *Fisher* does not, as Petitioner contends, stand for the general proposition that readback of testimony is a "critical" phase of the trial proceedings.

This Court concludes that, on the facts of this case, the readback of testimony previously received in evidence did not rise to a level requiring that the proceeding be open to the public.  First, there is no question that Petitioner had notice of the jury's request and was present during

United States District Court

For the Northern District of California

1  the proceedings, as was the judge.  These facts thus distinguish the case from *Fisher.*  Second,

2  unlike suppression hearings, readback of testimony does not often resemble a bench trial, and

3  does not necessarily implicate the concerns underlying the public trial right.  As noted by the

4  Court of Appeal, the readback procedure generally involves the court reporter rereading

5  testimony that has already been received in evidence.  Thus, the public already has had an

6  opportunity to hear the evidence and already has been given the chance to determine whether

7  established courtroom procedures were followed and whether the judge and the prosecutor

8  carried out their duties responsibly.  Further, additional witnesses have had the opportunity to

9  come forward, diminishing the threat of perjury.  Finally, as noted, Petitioner was present, and

10  had the opportunity to ensure the testimony was read in an accurate and complete fashion.

11  Accordingly, the Court concludes that the state court's application of clearly established federal

12  law was not objectively unreasonable.

13  **CONCLUSION**

14          For the reasons set forth herein, the Court hereby DENIES the petition for writ of habeas

15  corpus.  A separate judgment shall issue, and the Clerk is directed to close the file.

16          **IT IS SO ORDERED.**

17  Dated:  January 30, 2007

18  _____
        JEFFREY S. WHITE
        UNITED STATES DISTRICT JUDGE